IN THE CIRCUIT COURT FOR THE FOURTH JUDICIAL CIRCUIT
IN AND FOR DUVAL COUNTY, FLORIDA

SHAUN FARRELL,

    Plaintiff,

v.                                           Case No.: 2018-CA-7382
                                            JURY TRIAL DEMANDED
AARON'S, INC.,                         CV-F

    Defendant.
_____/

## COMPLAINT

COMES NOW, the Plaintiff, SHAUN FARRELL (hereinafter "Plaintiff" or "FARRELL"), and sues Defendant AARON'S, INC. (hereinafter "Defendant" or "AARON'S"), alleging as follows:

### NATURE OF THE ACTIONS

1. Plaintiff sues AARON'S and individuals exercising sufficient control over the business under Count I pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.* This action claims that AARON'S individuals exercising sufficient control over the business knowingly violated the wage-and-hour provisions of the FLSA by depriving the Plaintiff of his lawful overtime wages.

2. At all times material hereto, Plaintiff was employed by AARON'S as a Regional Manager, was under the control of time, place and manner of work by AARON'S, and regularly worked overtime hours, as defined by the FLSA, and is entitled to overtime compensation for those hours. AARON'S and individuals exercising sufficient control over the business are liable for failing to pay Plaintiff for overtime hours worked in excess of forty (40) hours per week at a rate of one-and-one-half times her regular rate of pay.

3. Plaintiff seeks unpaid compensation, an equal amount of liquidated damages and prejudgment interest, attorneys' fees, and cost pursuant to 29 U.S.C. § 216(b).

4. Plaintiff was routinely and frequently subject to reprisal and retaliation for reporting sexual harassment of a superior on a co-worker, that violated federal and state law, and was terminated not only once, but twice, as a result thereof.

5. Plaintiff sues AARON'S in Count II pursuant to Fla. Stat. 448.102(3), because an employer may not take any retaliatory personnel action against an employee because the employee has objected to, or refused to participate in, any activity of employer which is in violation of a law, rule, or regulation.

6. Plaintiff sues AARON'S in Count III under the anti-retaliation provisions of the Federal Civil Rights Act.

7. Plaintiff sues AARON'S in Count IV in equity for declaratory judgment.

## JURISDICTION AND VENUE

8. This Court has broad subject matter jurisdiction to hear federal claims both under the Fair Labor Standards Act, 29 U.S.C. §§ 201, *et. seq.* and the anti-retaliation provisions of the Federal Civil Rights Act.

9. This Court has subject matter jurisdiction to hear claims arising under Florida statutory and common law, including claims under Chapter 448, Fla. Stat.

10. Venue is proper in the Circuit Court for Duval County because Defendant does business there and, as detailed below, a substantial part of the events or omissions giving rise to the claims occurred there.

## THE PARTIES

11. Plaintiff is a resident of Florida and had been employed by Defendant for about 10 years, and as a Regional Manager for them for about 4.5 years (with one short interruption) prior to his termination on September 17, 2018. Plaintiff routinely worked hours in excess of forty (40) hours per workweek, without receiving overtime compensation as required by state and federal law.

12. AARON'S is a Georgia Corporation, but maintains offices in Florida, including Duval County, and conducts business in Duval County as well as all of Florida.

## GENERAL ALLEGATIONS

13. Plaintiff does not qualify for the executive exemption under the FLSA (per United States Department of Labor guidelines), to wit:

    a. Plaintiff spent about 2-3 hours per week devoted in interviewing prospective employees (well less than 5% of his work week). He mainly conducted secondary interviews for select positions.

    b. Plaintiff spent less than 1% of his time per week recruiting employees (less than 30 minutes per week on average). He would merely pass out flyers and cards.

    c. Plaintiff spent nearly no time per week or annually training new employees. Training is done by corporate the first few weeks online with the learning and development department. The manager of that location did the rest. Plaintiff would sometimes follow up that the training was getting done.

    d. Plaintiff had no authority to set or change anyone's pay. This was a totally corporate decision. General managers are paid based off a pay grid that was non-negotiable and hourly employees got reviews once a year and was given increases

      based on numbers provided by raw data from the system and general managers review.

e. As for directing the work of employees, Plaintiff spent time making sure that employees were completing tasks that were standard requirements of the company, not his own. He never directed the tasks of anyone, he just assured compliance with company directives.

f. Plaintiff did not have the responsibility to maintain production or sales records for use in supervision or control of employees. Each store has its own goal boards used to document sales and the company set forth goals and numbers to hit, and he would have discussions with associates based on their achieving the company goals.

g. Plaintiff had an extremely limited role in appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status. The general managers would make recommendations of promoting within their store and would discuss it with Plaintiff. At best, he could recommend people to manager positions but his manager and human resources would have to agree. Most often, he was not given the ability to make the decision he wanted.

h. Plaintiff played no role in handling employee complaints and grievances and was required to escalate such to HR. His role in these issues would be to simply execute Human Resources recommendations.

i. Plaintiff's role in disciplining employees was limited to general managers and assistant managers, but only upon approval of area managers or the associate resources department.

j. Plaintiff had no role in planning employees' daily work.

k. Plaintiff had no involvement in determining the techniques of how employees accomplished their tasks.

l. Plaintiff played no role in apportioning the work among the employees. Workloads were assigned by general managers or by the corporate office.

m. Plaintiff was not responsible for determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold. Supplies were ordered by the general managers and merchandise ordered by general managers and force shipments sent by home office.

n. Plaintiff had no control over the flow and distribution of materials or merchandise and supplies.

o. Plaintiff had no responsibility to provide for the safety and security of the employees or Aaron's property.

p. Plaintiff had no influence in the planning and controlling of the Company budget.

q. Plaintiff was not responsible for implementing legal compliance measures. If he was made aware of misconduct or a legal issue, he was required to escalate it to Associate Resources (HR department).

r. As a Regional Manager, Plaintiff was not assigned to a unit with permanent status and function. His region was not static. The Jacksonville region changed names a few times, as well as the number of stores and employees.

s. It was not a regular part of Plaintiff's job duties to make new hire recommendations. In the system, he had to approve some new hires, but most of the new hires were not brought on by him. He only interviewed candidates that were entering the management program and usually did that as secondary interviews after the general

managers interviewed the candidate first. He only had authority to hire candidates under certain guidelines such as salary requirements, work history, background, rehire eligibility and only after they passed home office assessments. If the candidate did not meet these requirements, he had to push to the next level above him for approval which could require his manager to interview that candidate as well. He also almost never hired someone and put that candidate into a store -- the general manager had to agree with hiring the candidate. He also did not get involved with the hiring process of employees not entering the management program such as delivery drivers or customer service representatives.

t. When participating in a hiring decision, Plaintiff's input was considered merely as a suggestion or recommendation, and was definitely evaluated by his superior and decision rested with him (or her).

14. AARON'S was Plaintiff's employer within the meaning of 29 U.S.C. § 203(d), is engaged in interstate commerce, and controlled and managed Plaintiff by its management in Georgia and Florida. Plaintiff was in the employ of AARON'S within the meaning of 29 U.S.C. § 203(g).

15. Individuals exercising sufficient control over AARON'S are individually liable under the Fair Labor Standards Act, 29 U.S.C. §§ 201, *et. seq.*

16. At all relevant times, AARON'S is and was legally responsible for all of the unlawful conduct, policies, practices, acts and omissions as described in each and all of the foregoing paragraphs as the employer of Plaintiff.

17. At all relevant times, the unlawful conduct against Plaintiff as alleged herein was actuated, in whole or in part, by a purpose to serve AARON'S. At all relevant times, upon

information and belief, the unlawful conduct alleged herein was reasonably foreseeable by AARON'S, and committed intentionally under actual or apparent authority granted by AARON'S such that all of the alleged unlawful conduct is legally attributable to AARON'S.

18. The overtime wage provisions set forth in § 206 and § 207 of the FLSA apply to AARON'S. Plaintiff's job is not a position involving work that falls within any exception or exemption to 29 U.S.C. § 213(a)(1).

19. During the course of Plaintiff's employment, Plaintiff worked approximately 4,000 overtime hours without compensation.

20. Plaintiff reported sexual harassment in early 2015 to Rebecca Sosa, then AR manager of AARON'S. The report entailed Tom Jackson, Senior Regional Manager, harassing Krista Depperschmidt, Assistant Regional Manager, who at that time was his subordinate.

21. Ms. Sosa, AR manager, then notified Joe Fedorchak, the acting divisional Vice President (Plaintiff's direct report). Joe Fedorchak had a very close working relationship with Tom Jackson and took Plaintiff's reporting of Mr. Jackson for sexual harassment personally. Within weeks of his reporting the harassment, in reprisal for reporting Tom Jackson, Mr. Fedorchak took two stores away from Plaintiff, which impacted Plaintiff's performance and future pay.

22. Mr. Fedorchack thereafter cussed at Plaintiff often, and made his work life unbearable. Plaintiff then complained about this retaliation to Ms. Sosa multiple times which enraged Mr. Fedorchack further. At a meeting with Mr. Fedorchack and Ms. Sosa in Orlando in August of 2015, Plaintiff went on a break when Ms. Sosa approached him and asked if he was "okay". Plaintiff then explained that the retaliation was becoming unbearable. Very

shortly thereafter Ms. Sosa approached him with a resignation letter that she wrote, telling Plaintiff that he had to sign and leave the Company. Initially, Plaintiff did not want to, but Ms. Sosa represented that he had only two options: quit or resign. Plaintiff was constructively discharged when he was forced to sign the resignation letter.

23. After departing the Company, Plaintiff contacted the COO of AARON'S and explained his reporting of the sexual harassment of Tom Jackson on Krista Depperschmidt, and the subsequent reprisal and forced resignation. After three months of negotiating reinstatement with AARON'S, Plaintiff was reinstated.

24. As a condition for reinstatement, Plaintiff was required to participate in defendant's Long-Term Cash-Settled Stock Unit Incentive Plan, which in turn required him to be bound by a Performance-Based Stock Unit Award Agreement (hereinafter "Agreement"), which included non-recruitment, non-solicitation and non-competition restrictive covenants. See "Agreement", attached hereto as Exhibit "A".

25. Unbeknownst to Plaintiff, at the time of Plaintiff's execution of the Agreement, AARON'S had no desire to continue to employ Plaintiff free from retaliation and harassment, and continued to engage in reprisal against him, as further indicated below. AARON'S, with fraudulent intent, induced Plaintiff to be bound by non-competition covenants without ever intending to honor the entire Agreement.

26. As a further inducement of reinstatement with restrictive covenants, Plaintiff was told that Mr. Fedorchak would have no communication with him. A middle manager, Tim Bailey, was put over Plaintiff as a "buffer". However, Mr. Fedorchak, acting on behalf of AARON'S, did not abide by the spirit or language of the new agreement and made things difficult for Mr. Bailey; in fact Bailey was soon demoted and replaced by Chris Schotter.

27. Mr. Schotter soon suffered the same problems with Mr. Fedorchack. In the summer of 2017, Mr. Fedorchak left the company and Charles Cole ultimately took his place in January 2018. Mr. Schotter took a different position in south Florida. Neal Weldon transferred over and took Mr. Schotter's position. On a visit with Mr. Cole, Mr. Weldon told Plaintiff that he knew of Plaintiff's "reputation of being difficult and hard to manage", and knew of "the past" because Chris Schotter had told him. Later that day, Plaintiff called Mr. Schotter and Mr. Schotter admitted he said that to Mr. Cole.

28. As a result of the Plaintiff reporting sexual harassment, the Company labeled and targeted him (even after reinstatement). Mr. Weldon even harassed Plaintiff, telling him often he was going to fire him. This forced Plaintiff to ultimately utilize the corporate hotline 1-800 number to report Mr. Weldon and Mr. Cole for the threats and poor treatment.

29. As a result of Plaintiff's use of the corporation's hotline, in whole or in part, Plaintiff was terminated.

30. Plaintiff also had applied for other positions at AARON'S that he was more than qualified for, but was rejected. He was never allowed promotion in retaliation for reporting sexual harassment or for reporting retaliation itself, even after his reinstatement.

31. Plaintiff has retained the undersigned counsel and is obligated to pay him a reasonable fee for his services.

## COUNT I - CLAIM FOR RELIEF UNDER FLSA

32. Plaintiff alleges and incorporates by reference paragraphs 1-18 of this Complaint as if fully alleged herein.

33. This is an action for damages in excess of $15,000.00.

34. Plaintiff is entitled to all the overtime wages he earned, pursuant to the FLSA.

Case 3:18-cv-01490-HES-JRK Document 1-1 Filed 12/18/18 Page 10 of 20 PageID 14

35. AARON'S did not track or record Plaintiff's hours for each work week as required by the Fair Labors Standards Act, and hence Plaintiff's reasonable calculations of overtime worked is presumed accurate.

36. Because AARON'S willfully violated the FLSA, a three-year statute of limitations applies to such violations, pursuant to 29 U.S.C. § 255.

37. As a result of AARON'S FLSA violations, Plaintiff suffered damages by being denied overtime wages in accordance with § 206 and § 207 of the FLSA.

38. AARON'S has not made a good faith effort to comply with the FLSA with respect to its compensation of Plaintiff.

39. Because of AARON'S unlawful acts, Plaintiff has been deprived of overtime compensation in amounts to be determined at trial, is entitled to recovery of such amounts, liquidated damages, prejudgment interest, attorneys' fees, costs, and other compensation pursuant to 29 U.S.C. § 216(b).

WHEREFORE, the Plaintiff prays for the following relief:

    A. a declaratory judgment that the practices complained of herein are unlawful under FLSA;

    B. an award of damages, against AARON'S *and any individuals exercising sufficient control over AARON'S*, according to proof, including unpaid wages and liquidated damages pursuant to 29 U.S.C. § 201 *et seq.* and the supporting United States Department of Labor regulations;

    C. penalties available under applicable law;

    D. pre- and post-judgment interest, as provided by law;

    E. attorneys' fees and costs; and

F. such other relief as this Court shall deem just and proper.

**COUNT II – VIOLATION OF FLA. STAT. 448.102(3) AGAINST AARON'S**

40. Plaintiff alleges and incorporates by reference paragraphs 1-30 of this Complaint as if fully alleged herein.

41. This is an action for damages in excess of $15,000.00.

42. Plaintiff objected to the aforementioned illegal sexual harassment and the unlawful retaliation therefrom, and as a result, was terminated in violation of Fla. Stat. 448.102(3).

43. Plaintiff suffered damages as a result of AARON'S' unlawful conduct.

44. Plaintiff is entitled to reasonable attorney's fees pursuant to Fla. Stat. 448.104.

WHEREFORE, the Plaintiff demands judgment against AARON'S for damages, for an award of attorney's fee and costs, and for all further relief that is just and proper.

**COUNT III – VIOLATION OF 42 U.S.C. § 2000e-3(a) AGAINST AARON'S**

45. Plaintiff alleges and incorporates by reference paragraphs 1-30 of this Complaint as if fully alleged herein.

46. This is an action for damages in excess of $15,000.00.

47. Plaintiff objected to the aforementioned illegal sexual harassment and the unlawful retaliation therefrom, and as a result, was terminated in violation of 42 U.S.C. § 2000e-3(a).

48. Plaintiff suffered damages as a result of AARON'S' unlawful conduct.

49. Plaintiff is entitled to reasonable attorney's fees pursuant to Title VII, Federal Civil Rights Act.

WHEREFORE, the Plaintiff demands judgment against AARON'S for damages, for an award of attorney's fee and costs, and for all further relief that is just and proper.

## COUNT IV – ACTION FOR DECLARATORY JUDGMENT

50. Plaintiff alleges and incorporates by reference paragraphs 1-30 of this Complaint as if fully alleged herein.

51. This is an action for the equitable relief of declaratory judgment.

52. Plaintiff seeks a determination from this Honorable Court that the restrictive covenants in the Agreement are, in equity, unenforceable or void for any or all of the following reasons:

    a. The restrictive covenants are not supported by any consideration;

    b. AARON'S fraud in the inducement of the restrictive covenants;

    c. AARON'S pattern of harassment and retaliation against Plaintiff for reporting sexual harassment;

    d. The restrictive covenants are, under the circumstances, void against public policy;

    e. AARON'S failure to pay Plaintiff his legal wages under the FLSA;

    f. AARON's has generally acted maliciously against Plaintiff, or otherwise acted in bad faith against Plaintiff;

    g. AARON'S has previously permitted or otherwise released similarly situated employees to compete under the same restrictive covenants.

WHEREFORE, the Plaintiff demands this Honorable Court to enter judgment against AARON'S, declaring the restrictive covenants void or unenforceable, and for all further relief that is just and proper.

[this space intentionally left blank]

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury on all questions of fact raised by the Complaint.

Dated: October 29, 2018.

                                                    S/Richard F. Meyers  
                                                    Richard F. Meyers, Esquire  
                                                    THE MEYERS FIRM, P.A.  
                                                    P.O. Box 16308  
                                                    Temple Terrace, Florida 33687-6308  
                                                    (813)985-6550; (813)985-5282 (fax)  
                                                    Fla. Bar No. 0893315  
                                                    Attorney for Plaintiff



"A"

May 17, 2017

# AARON'S, INC. LONG-TERM CASH-SETTLED STOCK UNIT INCENTIVE PLAN

## PERFORMANCE-BASED STOCK UNIT AWARD AGREEMENT

Aaron's, Inc. (the "Company") hereby grants to [NAME] ("you"), pursuant to the Aaron's, Inc. Long-Term Cash-Settled Stock Unit Incentive Plan, as may be amended from time to time (the "Plan"), an Award of Stock Units (as defined in the Plan) effective as of April 15, 2017, the terms and conditions of which are set forth in the Plan and in this Stock Unit Award Agreement (the "Award Agreement"), as follows:

**Grant Date:**        April 15, 2017

**Target Award:**      150 Stock Units

**Performance Period:** January 1, 2017 to December 31, 2017

You can earn between 0% and 200% of your Target Award of Stock Units depending on the extent to which the applicable Performance Goals are satisfied for the Performance Period. Within 60 days following the completion of a Performance Period, the Administrator will determine the extent to which the designated Performance Goals have been satisfied and will calculate and certify in writing (the "Administrator Certification") the number of Stock Units you have earned (your "Earned Stock Units"). The applicable Performance Goals, weightings, performance levels and the calculation methodology for the current Performance Period are all set forth in Exhibit 1 attached hereto. Immediately following the date of the Administrator Certification, any Performance-Based Stock Units which are not Earned Stock Units shall be immediately forfeited. You will vest with respect one-third (1/3rd) of your Earned Stock Units on March 15 in each of the first, second and third calendar years following the year of the Grant Date, provided that you remain continuously employed with the Company on each such vesting date. (There are special vesting rules if you die, become Disabled, or if your employment is terminated following a Change in Control of the Company.) No later than 60 days after the date your Earned Stock Units vest, the Company will make a cash payment to you equal to the cash value of your Earned Stock Units based on the closing price of the Company's Stock on the vesting date. This award of Stock Units does not give you any rights of a shareholder, including the right to vote or to receive dividends.

By signing below or by signing via other electronic means acceptable to the Company, you accept the Award of Stock Units subject to the terms and conditions of the Plan (which are fully incorporated herein by reference). In addition, you agree to comply with and be bound by the restrictive covenants included as an Addendum to this Award Agreement. In the event there is a conflict or inconsistency between any provision in this Award Agreement and one or more provisions of the Plan, the provisions of the Plan shall govern. Capitalized terms used in this Award Agreement that are not otherwise defined herein shall have the same meanings as defined in the Plan. You acknowledge receipt of a copy of the Plan, and hereby accept the Award subject to all of its terms and conditions. You authorize the Company to withhold from any payment under the Plan, any federal, state or local income and/or payroll taxes required by law to be withheld.

| PARTICIPANT | COMPANY |
|---|---|
| Farrell, Shaun | AARON'S, INC. |
| _____ | By:_____ |

| | |
|---|---|
| Signature | Robert W. Kamerschen, EVP, General Counsel, Corporate Secretary and Chief Administrative Officer |
| _____ | |
| Date | |

Date:_____

### Restrictive Covenant Addendum ("Addendum")

You acknowledge that Aaron's, Inc. (the "**Company**") may disclose (and/or has already disclosed) to you and you may be provided with access to and otherwise make use of, certain valuable, Confidential Information (as defined below) of the Company. You also acknowledge that due to your relationship with the Company, you will develop (and/or has developed) special contacts and relationships with the Company's employees, customers, suppliers and vendors and that it would be unfair and harmful to the Company if you took advantage of these relationships to the detriment of the Company. For purposes of this Addendum, references to the Company shall be deemed to include references to any subsidiary of the Company.

You agree that during your employment and for a period of one (1) year following any voluntary or involuntary termination of employment with the Company (regardless of reason), you will not directly or indirectly, individually, or on behalf of any Person other than the Company:

(a)     solicit, recruit or induce (or otherwise assist any Person in soliciting, recruiting or inducing) any employee or independent contractor of the Company who performed work for the Company within the final year of your employment with the Company to terminate his or her relationship with the Company;

(b)     knowingly or intentionally damage or destroy the goodwill and esteem of the Company, the Company's Business or the Company's suppliers, employees, patrons, customers, and others who may at any time have or have had relations with the Company;

(c)     solicit the Company's Customers, directly or indirectly, for the purpose of providing products or services that are competitive with those provided by the Company; or

(d)     engage in or otherwise provide Services, directly or indirectly, within the Territory, to or for any Person or entity engaged in a business that competes directly or indirectly with the particular segment(s) of the Company's Business for which you performed Services. Businesses that compete with the Company specifically include, but are not limited to, the following entities and each of their subsidiaries, affiliates, franchisees, assigns and successors in interest: AcceptanceNow; American First Finance, Inc.; American Rental; Bi-Rite Co., d/b/a Buddy's Home Furnishings; Bestway Rental, Inc.; Better Finance, Inc.; Bluestem Brands, Inc.; Conn's, Inc.; Crest Financial; Curacao Finance; Easyhome, Inc.; Flexi Compras Corp.; FlexShopper LLC; Fortiva Financial, LLC; Genesis Financial Solutions, Inc.; Lendmark Financial Services, Inc.; Mariner Finance, LLC; Merchants Preferred Lease-Purchase Services; New Avenues, LLC; Okinus; Premier Rental-Purchase, Inc.; OneMain Financial Holdings, Inc.; Purchasing Power, LLC; Regional Management Corp.; Rent-A-Center, Inc. (including, but not limited to, Colortyme); Santander Consumer USA Inc.; Tidewater Finance Company; Tempoe LLC; and WhyNotLeaseIt.

You further agree that during your employment and thereafter, you will not, except as necessary to carry out your duties as an employee of the Company, disclose or use any Confidential Information without the Company's prior written consent. Your obligation of non-disclosure as set forth herein is in addition to, and not in lieu of, any other obligations you have to protect Confidential Information (including, but not limited to, obligations arising under the Company's policies, ethical rules and applicable law), and such obligation shall continue for so long as the information in question continues

to constitute Confidential Information. You further agree that, upon termination of your employment with the Company for any reason whatsoever or upon the Company's request at any time, you will deliver promptly to the Company all materials (including electronically-stored materials), documents, plans, records, notes, or other papers, and any copies in your possession or control, relating in any way to the Company's Business or containing any Confidential Information of the Company, which at all times shall be the property of the Company.

For purposes of this Addendum, the following terms shall have the meanings specified below:

(a) "**Company's Business**" means the businesses of (i) financing, renting, leasing and selling new, rental or reconditioned residential furniture, electronic goods, household appliances, and related equipment and accessories; and/or (ii) providing web-based, virtual or remote lease-to-own programs or financing; and/or (iii) issuing consumer credit cards and credit card and other consumer credit accounts, making consumer loans, cash advances and other extensions of credit and engaging in any other programs or activities for the origination or acquisition of loans, receivables or other payment obligations of consumers.

(b) "**Confidential Information**" means information, without regard to form and whether or not in writing, relating to the Company's Business that is disclosed to you, or of which you become aware through your relationship with the Company, and which has value to the Company and is not generally known to the Company's competitors. Confidential Information includes, but is not limited to, technical or non-technical data (including non-public personnel data relating to Company employees), formulas, patterns, compilations (including compilations of customer information), programs, devices, methods, techniques (including rental, leasing, and sales techniques and methods), processes, financial data (including rate and price information concerning products and services provided by the Company), or lists of actual or potential customers (including identifying information about customers and potential customers). Such information and compilations of information shall be contractually subject to protection under this Agreement whether or not such information constitutes a trade secret and is separately protectable at law or in equity as a trade secret. Confidential Information includes information disclosed to the Company by third parties that the Company is obligated to maintain as confidential. Confidential Information does not include any information that has been voluntarily disclosed to the public by the Company (except where such public disclosure has been made by you or another Person without authorization) or that has been independently developed and disclosed by others, or that otherwise enters the public domain through lawful means.

(c) "**Customers**" means all customers of the Company (i) with whom you have had contact on behalf the Company, (ii) whose dealings with the Company were coordinated or supervised by you, or (iii) about whom you obtained Confidential Information, in each case during the twelve (12) calendar months preceding termination of your employment with the Company.

(d) "**Person**" means any individual, corporation, bank, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or other entity.

(e) "**Services**" means the services that you provide or have provided for the Company within two (2) years prior to the date of termination of your employment.

(f) "**Territory**" means, (i) if you are a corporate associate or a Progressive associate, the United States, and (ii) if you are an employee whose duties relate only to certain store locations or regions, the State(s) in which you have provided Services or have been assigned responsibilities on behalf of the Company during the two (2) year period prior to the date of termination of your employment. You agree that the Company conducts the Company's Business in the Territory.

If, during your employment with the Company or at any time during the restrictive periods described above, you violate the restrictive covenants set forth in this Addendum, then the Company may, notwithstanding any other provision in this Agreement to the contrary, cancel any Stock Units

outstanding under this Agreement that have not yet been paid. The parties further agree and acknowledge that the rights conveyed by this Agreement are of a unique and special nature and that the Company will not have an adequate remedy at law in the event of your failure to abide by its terms and conditions nor will money damages adequately compensate for such injury. It is, therefore, agreed between the parties that, in the event of a breach by you of any of your obligations contained in Addendum of this Agreement, the Company shall have the right, among other rights, to damages sustained thereby and to obtain an injunction or decree of specific performance from any court of competent jurisdiction to restrain or compel you to perform as agreed herein. You agree that this Addendum shall survive the termination of your employment. Nothing contained herein shall in any way limit or exclude any other right granted by law or equity to the Company.

Notwithstanding any other provision of this Addendum, nothing contained herein limits your ability to file a charge or complaint with the Equal Employment Opportunity Commission, the National Labor Relations Board, the Occupational Safety and Health Administration, the Securities and Exchange Commission or any other federal, state or local governmental agency or commission (collectively, "**Government Agencies**"), nor restricts you from providing truthful testimony in response to a lawfully issued subpoena or court order, nor limits your ability to communicate with any Government Agencies or otherwise participate in any investigation or proceeding that may be conducted by any Government Agency, including providing documents or other information, without notice to the Company. Under the Defend Trade Secrets Act: (1) no person will be held criminally or civilly liable under federal or state trade secret law for disclosure of a trade secret (as defined in the Economic Espionage Act) that is: (A) made in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney, and made solely for the purpose of reporting or investigating a suspected violation of law; or, (B) made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal so that it is not made public; and (2) a person who pursues a lawsuit for retaliation by an employer for reporting a suspected violation of the law may disclose the trade secret to the attorney of the person and use the trade secret information in the court proceeding, if the person files any document containing the trade secret under seal, and does not disclose the trade secret, except as permitted by court order.

## EXHIBIT 1

### Performance Goals, Weightings, and Performance Levels

The Performance Goals applicable to Awards of Stock Units for the Performance Period January 1, 2017 through December 31, 2017 shall be:

**Aaron's Business EBITDA**- the earnings before interest, taxes, non-lease merchandise depreciation and amortization for Aaron's, Inc. (excluding EBITDA from Progressive and DAMI) determined on an accrual basis, as reported by Aaron's, Inc. on a non-GAAP basis.

**Combined Revenue**-- the total revenue for Aaron's, Inc. (including all revenue from Progressive and DAMI) determined on an accrual basis, as reported by Aaron's, Inc. on a GAAP basis.

Each Performance Goal is a separate measure, with 40% of the Participant's Target Award based on Aaron's Business EBITDA and 60% of the Target Award based on Combined Revenue. The maximum number of Stock Units that may be earned with respect to achievement of each Performance Goal is 200% of the portion of the total Target Award attributable to that Performance Goal. For example, if the maximum level of Aaron's Business EBITDA is exceeded but Combined Revenue is less than the threshold level, the Grantee will earn 80% of the Target Award (200% of 40% for the Aaron's Business EBITDA Performance Measure and 0% of 60% for the Combined Revenue Performance Measure).

The Performance Goals and the corresponding percentage earned for threshold, target and maximum performance levels (as well as for levels between the threshold and maximum) are shown on the following table:

| Performance Level ($000) | 85% Threshold | 90% | 95% | Target Band (Min./Max.) | 105% | 110% | 115% Maximum |
|---|---|---|---|---|---|---|---|
| Combined Revenue ($000) | $2,749,675 | $2,911,421 | $3,073,166 | $3,202,563 to $3,267,261 | $3,396,657 | $3,558,403 | $3,720,148 |
| Payout % of Target – Combined | 25% | 70% | 95% | 100% | 116% | 156% | 200% |
| Aaron's Business EBITDA ($000) | $136,214 | $144,227 | $152,240 | $157,047 to $163,457 | $168,265 | $176,277 | $184,290 |
| Payout % of Target – Aaron's Business | 25% | 75% | 95% | 100% | 112% | 152% | 200% |

Straight line interpolation will be used between each of the levels shown on the table above. No amount will be earned with respect to a Performance Goal if the performance is below the threshold level. A maximum of 200% will be earned with respect to a Performance Goal regardless of performance in excess of the maximum level.

To determine the Earned Shares, the "Payout % of Target" will be multiplied by the applicable weighting percentage for each Performance Measure (60% for Combined Revenue and 40% for Aaron's Business EBITDA). These percentages will be added together and then multiplied by the Grantee's Target Award.

## Determination and Adjustment of Earned Award

In determining Aaron's Business EBITDA and Combined Revenue, generally accepted accounting principles shall be applied on a basis consistent with prior periods, and such determination shall be based on the calculations made or approved by the Company's Chief Financial Officer. Performance

will be based upon the financial results of Aaron's on the accrual basis as reported on a non-GAAP basis.

Within 60 days after the end of the Performance Period, the Administrator shall review the financial results and certify to what extent the Performance Measures are satisfied and will determine the Earned Award for the Grantee. In reviewing the financial results and making determinations as to the Earned Award, the Administrator shall exclude the effects of material unexpected, unusual, infrequently occurring and/or non-recurring items including (i) changes in tax laws or regulations or accounting procedures, (ii) reorganizations, restructurings, mergers, acquisitions or divestitures, and (iii) litigation or the resolution of litigation, or (iv) other sufficiently noteworthy items that require disclosure in a press release, if the exclusion of the effects of such items increases the amount of the Earned Award.

After excluding the effects of such items, the Administrator shall have the discretion to make other adjustments that would decrease, but not increase, the amount of the Earned Award. For example, in using such negative discretion to determine the final amount of the Earned Award, the Administrator may decide to ignore one or more adjustments made pursuant to the preceding paragraph. The Administrator may also use such negative discretion to exclude the effects of significant new customers or acquisitions that were not included by the Administrator when setting the targets and levels of required performance for each Performance Measure or to make other adjustments it determines are necessary or desirable to preserve the original intent of this Award of Performance Shares. The Administrator's exercise of negative discretion shall be final and binding upon all parties.

Accepted on May 17, 2017